**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

BRIAN MILLER, on behalf of himself and all others similarly situated,

Plaintiff,

v.

NUTRIEN LTD.; NUTRIEN AG SOLUTIONS; THE MOSAIC CO.; MOSAIC FERTILIZER, LLC; CF INDUSTRIES HOLDINGS, INC.; KOCH INDUSTRIES, LLC; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER WEVER, LLC; KOCH AGRONOMIC SERVICES, LLC; KOCH FERTILIZER, LLC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; CANPOTEX LTD.; INTERNATIONAL FERTILIZER ASSOCIATION; AND THE FERTILIZER INSTITUTE,

Defendants.

**Civil Case No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I. **INTRODUCTION** ........................................ 1

II. **PARTIES** ........................................ 4

A. Plaintiff ........................................ 4

B. Defendants ........................................ 4

Nutrien Defendants ........................................ 4

Mosaic Defendants ........................................ 5

CF Industries ........................................ 6

Yara Defendants ........................................ 6

Koch Defendants ........................................ 7

International Fertilizer Association ........................................ 9

The Fertilizer Institute ........................................ 10

III. **AGENTS AND CO-CONSPIRATORS** ........................................ 11

IV. **JURISDICTION AND VENUE** ........................................ 12

V. **FACTUAL ALLEGATIONS** ........................................ 14

A. Background on NPK Fertilizers ........................................ 14

B. Defendants Systematically Rolled Up the NPK Fertilizer Market Through Competitor Acquisitions ........................................ 16

C. Defendants' Conspiracy Caused Significant Price Increases of NPK Fertilizers. 18

D. Recent Price Inflation of the NPK Fertilizer Market Does Not Align with Market Trends ........................................ 21

1. Natural gas price increases indicate only a nominal correlation to rising and sustained NPK Fertilizer costs ........................................ 25

E. The U.S. NPK Fertilizer Market Is Marked by Indicia of Collusion.................... 27

1. The Manufacturer Defendants exchange confidential, competitively sensitive, proprietary information through IFA and TFI ........................................ 27

a. International Fertilizer Association ........................................ 27

b. The Fertilizer Institute ........ 30

2. The NPK Fertilizer market is characterized by inelastic demand. ........ 33

3. The NPK Fertilizer market has high barriers to entry. ........ 34

4. Nitrogen fertilizer products are highly homogenous ........ 34

5. Defendants also have motive and the opportunity to collude. ........ 35

6. Defendants coordinate activity suggests the formation of an NPK Fertilizer cartel ........ 36

F. Plaintiff and the Class Have Suffered Antitrust Injuries. ........ 37

VI. **CLASS ACTION ALLEGATIONS** ........ 38

VII. **TOLLING OF THE STATUTE OF LIMITATIONS** ........ 41

VIII. **CLAIMS FOR RELIEF** ........ 41

**COUNT I** ........ 41

**COUNT II** ........ 43

**COUNT III** ........ 43

IX. **PRAYER FOR RELIEF** ........ 44

X. **JURY DEMAND** ........ 45

Plaintiff BRIAN MILLER on behalf of himself and all others similarly situated brings this Class Action Complaint ("Complaint") for damages and injunctive relief against Defendants Nutrien Ltd. and Nutrien AG Solutions (together, the "Nutrien Defendants"); The Mosaic Co. and Mosaic Fertilizer, LLC (together, the "Mosaic Defendants"), CF Industries Holdings, Inc.; Koch Industries, LLC, Koch AG & Energy Solutions, LLC; Koch Fertilizer Wever, LLC, Koch Agronomics Services, LLC, and Koch Fertilizer, LLC (together, the "Koch Defendants"); Yara International ASA and Yara North America, Inc. (together, the "Yara Defendants"); Cantopex Ltd.; International Fertilizer Association; and The Fertilizer Institute, and states as set forth below.

## I. INTRODUCTION

1. The Nutrien Defendants, the Mosaic Defendants, CF Industries Holdings, Inc., the Koch Defendants, the Yara Defendants, and Cantopex Ltd. (together, the "Manufacturer Defendants") produce, manufacturer, supply, and sell NPK Fertilizer throughout the United States. "NPK Fertilizer" is a term used in the agricultural industry to describe the individual or combined use of nitrogen (N), potash (P), and phosphate (K) fertilizers, using the chemical symbol of each as its reference. Together, the Manufacturer Defendants control approximately 82% of the nitrogen market, 90 to 95% of the potash market, and 91% of the phosphate market in the United States. They have used their dominant market power to unlawfully suppress the country's NPK Fertilizer supply and artificially raise and fix prices.

2. Beginning on or around January 1, 2020, Defendants entered into an agreement, combination, or conspiracy to limit the supply and fix, raise, maintain, or stabilize prices of NPK Fertilizer sold in the United States at supra-competitive levels. As a result of Defendants' unlawful conduct, Plaintiff and the Class have paid artificially inflated prices for NPK Fertilizer for more than six years and, as a result, have suffered injuries in violation of federal antitrust laws.

3. Defendants' conspiracy has enabled the Manufacturer Defendants to increase their profit margins exponentially, while forcing U.S. farmers to pay inflated prices even when market conditions do not predict or deliver net crop income. The Manufacturer Defendants maintain elevated prices without concern that their competitors will try to steal their market share or for potential new market entrants because high barriers to entry prevent new competitors from entering the market.

4. Historically, the agriculture industry has been marked by boom-and-bust cycles where the cost of crop inputs, including fertilizers, would fluctuate in response to market demand, weather patterns, or supply chain disruptions impacting the supply of harvestable crops and ultimately impacting the revenue generated by independent U.S. farmers. But that market pattern changed markedly in 2008 when fertilizer prices steadily rose, spiking in times of global volatility, but failed to drop after the markets settled down. Prices also remained high regardless of the Manufacturer Defendants' costs.

5. Inflated NPK Fertilizer prices reached all-time highs beginning in the fall of 2021. Although this extreme spike aligned with some favorable conditions for U.S. farmer net income, the Manufacturer Defendants surreptitiously leveraged concurrent global disruptions to artificially inflate NPK Fertilizer prices with no intention of returning to a market-dependent pricing scheme. While net farm income decreased nearly 30% from 2022 to 2024, the Manufacturer Defendants' profits grew by nearly 300% and NPK Fertilizer prices increased by approximately 100%.

6. In response the burden imposed on U.S. farmers, Congress and the Department of Justice have initiated investigations into Defendants' impact on the NPK Fertilizer market and have begun to examine whether anticompetitive behavior is to blame.

7. On October 28, 2025, the U.S. Senate Judiciary Committee conducted a hearing on the issue entitled "Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries." Senators spoke with U.S. farmers, small seed manufacturers, industry scholars, and The Fertilizer Institute, a defendant here, seeking answers on how to curb the rising input costs that farmers face today. Farmers and researchers alike cited massive consolidation in the fertilizer and seed industries as the reason why agricultural input costs, including NPK Fertilizers, have reached an unsustainable level.

8. Months later, on January 21, 2026, USDA Deputy Secretary Stephen Vaden participated in a webinar with the National Agricultural Law Center. Vaden warned: "[A]ntitrust laws exist for a reason, and that reason is because when an industry gets too concentrated, that is to say there are too few people competing, bad things can happen that undermine free enterprise. And there are signs that that may be happening in American agriculture." The telltale signs of antitrust violations presently occurring include "the duopoly that is Mosaic and Nutrien and their successful efforts over the past several years to constrain fertilizer supply in this country and drive up the costs that farmers are paying." Vaden further acknowledged that these two Defendants were able to "constrain the supply of so many fertilizers our farmers depend" upon such that "they were able to get pricing power."

9. On March 4, 2026, Bloomberg reported that the Department of Justice has begun investigating the U.S. Fertilizer Market for possible price fixing, including multiple Manufacturer Defendants' practices.

10. Through the wrongful conduct described in this Complaint, Defendants have not only materially reduced or eliminated the historical boom-and-bust cycle of the agriculture

industry but also propped up fertilizer prices during periods of rapidly falling input costs by, among other means, coordinating pricing among manufacturers.

## II. PARTIES

### A. Plaintiff

11. **Plaintiff Brian Miller** is an independent family farmer located near Rushville, Missouri. Plaintiff Miller has purchased NPK fertilizer directly from at least one Defendant and has suffered antitrust injury as a result of the violations alleged in this Complaint.

12. At all relevant times, Brian Miller purchased NPK Fertilizers in the United States or its territories at inflated prices directly from one or more of the Defendants.

### B. Defendants

***Nutrien Defendants***

13. **Defendant Nutrien Ltd. ("Nutrien")** is a publicly traded Saskatchewan, Canada company with its principal place of business at 211 19th Street East, Suite 1700, Saskatoon, Saskatchewan, Canada, S7K5R6.

14. Nutrien is "the largest upstream fertilizer producer globally, with extensive midstream distribution capability." Nutrien boasts that with its "advantaged position across the ag value chain, [Nutrien] can anticipate trends, respond faster and more effectively produce and distribute the products and services that farmers need." At all relevant times, Nutrien, and or its wholly owned or controlled subsidiaries or affiliates, sold NPK Fertilizers in interstate commerce to purchasers in the United States.

15. This case arises out of or relates to Nutrien's purposeful availment of the NPK Fertilizer market in the United States and this District. Nutrien has distributed and promoted NPK Fertilizers in the United States and this District and has derived substantial financial gain from doing so.

16. **Defendant Nutrien Ag Solutions ("Nutrien Ag")** is the wholly owned subsidiary of Nutrien. Nutrien Ag's headquarters is located at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538.

17. At all relevant times, Nutrien Ag sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

***Mosaic Defendants***

18. **Defendant The Mosaic Company ("Mosaic")** is a Florida company with its principal place of business located at 101 East Kennedy Blvd., Suite 2500, Tampa, Florida 33602. Mosaic is a leading producer and marketer of potash and phosphate fertilizer.

19. At all relevant times, Mosaic sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20. **Defendant Mosaic Fertilizer, LLC ("Mosaic Fertilizer")** is a company incorporated in Delaware with its principal place of business located at 12800 Whitewater Drive, Suite 200, Minnetonka, Minnesota 55543. Mosaic Fertilizer is a subsidiary of Mosaic and produces fertilizer.

21. At all relevant times, Mosaic Fertilizer sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22. **Defendant Canpotex Ltd. ("Canpotex")** is a Saskatchewan, Canada company with its principal place of business at 409 Third Avenue South, Suite 700, Saskatoon, Saskatchewan, Canada S7K5R5. Canpotex is one of the world's largest potash exporters.

23. Canpotex is a "joint venture that is wholly owned by two Saskatchewan potash producers—Mosaic and Nutrien—with each shareholder having an equal ownership in the

company." At all relevant times, Canpotex sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24. This case arises out of or relates to Canpotex's purposeful availment of the NPK Fertilizer market in the United States and this District. Canpotex has distributed and promoted NPK Fertilizers in the United States and this District and has derived substantial financial gain from doing so.

***CF Industries***

25. **Defendant CF Industries Holdings, Inc. ("CF Industries")** is incorporated in Delaware and has its principal place of business in Illinois. CF Industries headquarters is located at 2375 Waterview Drive, Northbrook, Illinois, 60062. At all relevant times, CF Industries sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

***Yara Defendants***

26. **Defendant Yara International ASA ("Yara")** is a publicly traded Norwegian company with its principal place of business at Drammensveien 131, Oslo, Norway, NO-0277.

27. Yara is leading producer of fertilizers, including NPK Fertilizers, which it markets and distributes globally. At all relevant times, Yara, and or its wholly owned or controlled subsidiaries or affiliates sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

28. This case arises out of or relates to Yara's purposeful availment of the NPK Fertilizer market of the United States and this District. Yara has distributed and promoted NPK Fertilizers in the United States and this District and has derived substantial financial gain from doing so.

29. **Defendant Yara North America Inc. ("Yara NA")** is a wholly owned subsidiary of Yara. Yara NA is headquartered at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602. At all relevant times, Yara NA sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

***Koch Defendants***

30. **Defendant Koch Industries, LLC ("Koch")** is incorporated in Kansas. Koch's principal place of business is located at 4111 East 37th Street North, Wichita, Kansas, 67220. At all relevant times, Koch, and or its wholly owned or controlled subsidiaries or affiliates sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

31. **Defendant Koch Ag & Energy Solutions, LLC ("KAES")** is a wholly owned subsidiary of Koch. KAES' headquarters is located at 4111 East 37th Street North, Wichita, Kansas, 67220. At all relevant times, KAES sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

32. **Defendant Koch Fertilizer Wever, LLC ("Koch Wever"),** formally Iowa Fertilizer Company, LLC, is a wholly owned subsidiary of KAES, which is a subsidiary of Koch. Koch Wever is a nitrogen fertilizer plant located in Wever, Iowa, and its principal office is located at 4111 East 37th Street North, Wichita, Kansas, 67220. Koch Wever, then Iowa Fertilizer Company, opened in 2017 and was wholly owned by co-conspirator OCI Global until 2023. On December 18, 2023, OCI Global and KAES entered into a $3.6 billion agreement for the sale of 100% of OCI Global's equity interests in Iowa Fertilizer Company to KAES (the "Wever Acquisition"). The divestment was successfully completed on or before August 29, 2024.

33. In announcing the deal, KAES President Mark Luetters noted that Koch has invested $2 billion in North American fertilizer production facilities over the past 15 years.

34. The Wever Acquisition led to an increase in the total market share of the nitrogen fertilizer market held by Defendants Koch, CF Industries, and Nutrien.




35. **Defendant Koch Agronomic Services, LLC ("KAS")** is a wholly owned subsidiary of Koch. KAS' headquarters is located at 4111 East 37th Street North, Wichita, Kansas, 67220.

36. KAS is a global company and fertilizer producer and holds itself out as a "global provider of value-added solutions for the agriculture . . . market[]." At all relevant times, KAS sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

37. **Defendant Koch Fertilizer, LLC ("Koch Fertilizer")** is a wholly owned subsidiary of KAS, which is a subsidiary of Koch. Koch Fertilizer's principal office is located at 12747 Olive Blvd., Suite 300, St. Louis, Missouri 63141.

38. Koch Fertilizer and its affiliates hold themselves out as "one of the world's largest producers and marketers of fertilizer." At all relevant times, Koch Fertilizer sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

***International Fertilizer Association***

39. The International Fertilizer Association ("IFA") is a global fertilizer association incorporated and registered in the United Kingdom and headquartered in Paris, France. IFA's registered office is located at Confederation House, East of England Showground Peterborough, Cambridgeshire PE2 6XE, United Kingdom. IFA is a membership association comprised of "all actors in the fertilizer value chain."

40. Members of IFA "decide together on areas of common interest, joint actions and positions on emerging and complex issues facing the [fertilizer] industry today." IFA membership benefits include access to an industry data sharing platform and to events.

41. At all relevant times, IFA was an active participant in the conspiracy to fix, raise, maintain, or stabilize fertilizer prices in the United States. Nearly all Defendants and co-conspirators named in this Complaint are members of IFA. This includes Defendants CF Industries, KAES, KAS, Koch Fertilizer, Mosaic, Mosaic Fertilizer, Nutrien, Nutrien Ag, Yara, Yara NA, and The Fertilizer Institute. Members of the Manufacturer Defendants' leadership currently sit on IFA's Board of Directors. Co-conspirators BHP and J.R. Simplot Co. are also members of IFA.

42. At all relevant times, IFA acted as a co-conspirator of Manufacturer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

***The Fertilizer Institute***

43. **The Fertilizer Institute ("TFI")** is a trade association for fertilizer manufacturers located right outside of Washington, D.C. at 4201 Wilson Boulevard, Suite 700, Arlington, Virginia 22203. TFI is a membership association that claims to be "the voice of the fertilizer industry" which "truly represents every segment of the fertilizer supply chain." TFI encourages fertilizer manufacturers to become members for access to exclusive "market intelligence data" and recruits anyone who handles the "calculation of dues" related to fertilizer sales.



44. According to TFI, one of its key member benefits includes "access to trusted information and data." It specifically promises that manufacturer members will receive "access to member-only content and market intelligence data."

45. At all relevant times, TFI was an active participant in the conspiracy to fix, raise, maintain, or stabilize fertilizer prices in the United States. At least one Defendant from every group of Manufacturer Defendants is an active member of TFI. This includes Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic. Members of the Manufacturer Defendants' leadership currently sit on TFI's Board of Directors.

46. At all relevant times, TFI acted as a co-conspirator of Manufacturer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

## III. AGENTS AND CO-CONSPIRATORS

47. OCI N.V. ("OCI Global") is a publicly traded Dutch company, headquartered in Amsterdam, Netherlands. OCI Global produces and distributes nitrogen fertilizer. From 2013 to 2023, OCI Global was the parent company of Defendant Koch Wever. OCI Global developed Koch Wever, then Iowa Fertilizer Company, in 2013 as one of the largest private sector construction projects in Iowa's history and the first world-scale, greenfield nitrogen fertilizer plant built in the United States in over 25 years.

48. During the Class Period, OCI Global and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

49. BHP Group Limited ("BHP") is a publicly traded Australian company, headquartered in Melbourne, Australia. BHP produces "essential commodities" through assets

including potash. BHP holds interest in potash through wholly owned and operated ventures and through joint ventures not operated by BHP.

50. BHP operates a potash mine in Saskatchewan, Canada, (known as "Jansen"), which is expected to begin production in mid-2027. Once fully operational, Jansen will "become one of the world's largest potash mines." BHP does not currently sell fertilizer in the United States but has targeted the United States as a market for future Jansen potash production.

51. J.R. Simplot Company ("Simplot") is a privately held company incorporated in Nevada and headquartered in Boise, Idaho. Simplot is an international agricultural and food company whose portfolio includes phosphate mining and fertilizer manufacturing.

52. During the Class Period, Simplot and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV. JURISDICTION AND VENUE

53. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiff seeks damages in excess of $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

54. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), as more than one hundred members comprise the proposed class, plaintiff is a citizen of a state different than at least one defendant, and the amount in controversy exceeds $5,000,000.00, exclusive of interest costs.

55. This Court also has jurisdiction over any supplemental state law claims under 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

56. The Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found. Further, this Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an antitrust conspiracy that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

57. The activities of the Defendants, as described herein, were intended to and did have a direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

58. Venue is appropriate in this District pursuant to 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b) and (c), in that at least one or more of the Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## V. FACTUAL ALLEGATIONS

### A. Background on NPK Fertilizers

59. Plants require seventeen essential nutrients to grow, stay healthy, and produce food. A plant obtains three of these elements (carbon, hydrogen, and oxygen) through air and water, while the remaining fourteen must come from the soil through the plant's roots.

60. Among these soil-derived nutrients, nitrogen (N), phosphorus (P), and potassium (K) are the primary "macronutrients" upon which modern farming depends. Industrialized agriculture utilizes NPK Fertilizers to promote rapid seed growth and healthy crop development. Farmers may apply NPK Fertilizer individually or in blended formulations, often labeled with three numbers corresponding to the percentages of each nutrient.

***Nitrogen Fertilizers***

61. Nitrogen is essential to life on Earth. Nitrogen comprises more than 78% of Earth's atmosphere, but most of the planet's atmospheric nitrogen exists in an unreactive form, rather than the reactive form plants require. Nitrogen is necessary for plant growth and helps crops manufacture proteins and boosts crop yields. The nutritional quality of food depends heavily on an adequate nitrogen supply.

62. For thousands of years, the world's agriculture production relied on the limited quantity of reactive nitrogen that occurred naturally in soils and the ecosystem. The lack of bountiful reactive nitrogen was a limiting factor in crop production until the twentieth century, when chemists Fritz Haber and Carl Bosch developed an industrial-scale method to convert atmospheric nitrogen into a reactive nitrogen suitable for plants. This method of developing synthetic nitrogen is known as the "Haber-Bosch process" and serves as the foundation of the modern production of synthetic nitrogen fertilizer.

63. Today, roughly half of our global food production depends on synthetic nitrogen. Without access to synthetic nitrogen fertilizer, half of our global population would not survive.

64. Widely used nitrogen fertilizers include (a) ammonium nitrate, ammonium sulfate, and urea, formulated as solid granules (sometimes referred to a "prills"); or (b) urea ammonium nitrate (UAN) solution, formulated as a liquid. The nitrogen concentration and form vary among fertilizers, but all types are ultimately absorbed as nitrate or ammonium ions by the plant.

65. Today's nitrogen supply depends on synthetic production through the Haber-Bosch process. Barriers to entry into the synthetic nitrogen industry are high and cost-prohibitive for new market participants. A new nitrogen facility can cost approximately $5 billion to construct.

***Phosphorus Fertilizers***

66. Phosphate plays a vital role in how plants convert sunlight into energy and supports photosynthesis and energy transfer, root development and seed formation, cell division, cell enlargement, and the transfer of genetic information.

67. Phosphorus-based fertilizers come from phosphate rock, a naturally occurring mineral mined from geologic deposits. The rock is treated with sulfuric acid to release phosphorus and produce phosphoric acid. When combined with ammonia and sulfur, phosphoric acid can create various liquid and dry fertilizer products, including monoammonium phosphate (MAP), diammonium phosphate (DAP), and triple superphosphate (TSP).

***Potassium Fertilizers***

68. Plants need potassium to grow stronger, withstand drought stress, fend off insects and disease, use water more efficiently, and improve yield and quality. When plants have adequate potassium, they are healthier, more resilient, and more productive.

69. Potassium-based fertilizers originate from potassium chloride, also known as potash. Potash is mined from geological deposits of evaporite minerals, which were formed when ancient seas and saltwater lakes evaporated millions of years ago, leaving behind layers rich in potassium salts. After potash is mined, it is refined into different fertilizer products and shaped into small, uniform granules so farmers can apply it easily and plants can absorb the nutrients more efficiently.

**B. Defendants Systematically Rolled Up the NPK Fertilizer Market Through Competitor Acquisitions**

70. The NPK Fertilizer industry has experienced dramatic consolidation over the past four decades, transforming from a competitive market into a highly concentrated oligopoly dominated by the Manufacturer Defendants.

71. In the late 1970s and early 1980s, there were fifty-six major nitrogen companies, twenty-five companies that mined phosphate rock, and fifteen major potash companies operating in the United States and Canada.

72. By 2000, a period of hyper-consolidation in the fertilizer market left (a) six companies controlling 68% of the nitrogen fertilizer, (b) six companies controlling 88% of the phosphorus fertilizer, and (c) two companies, forming a Canadian oligopoly, controlling 85% of the potash fertilizer.

73. The market was further constrained by consolidation such that by 2012, four companies controlled 75% of nitrogen fertilizer, three companies controlled 90% of the

phosphorus fertilizer, and the U.S. imported nearly 90% of its potash from Canada, where the market was under control of only three companies.




74. As of 2024, the NPK Fertilizer industry is dominated by three corporations—Nutrien, Mosaic, and CF Industries—which exercise monopoly power over their respective segments in North America: Mosaic reigns over the phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the potash market as the leading member of a duopoly with Mosaic.

75. Market concentration in the NPK Fertilizer industry can be measured by the Herfindahl-Hirschman Index ("HHI"), a calculation that assigns a number from 0 to 10,000 to firms in an industry to quantify competition levels. The higher the HHI, the less competition exists in the industry. Scores ranging from 1,800 to 2,500 indicate high market concentration, and a score

above 2,500 suggests the possibility of an oligopoly or monopoly. The NPK Fertilizer market shows extremely high levels of concentration in North America.

| Fertilizer | *HHI in 2011* | | *HHI in 2022* | | |
|---|---|---|---|---|---|
| | **North America** | **World** | **United States** | **North America** | **World** |
| **Nitrogen** | 2,107 | 964 | 2,382 | 2,242 | 368 |
| **Potash** | 4,604 | 1,486 | 3,455 | 4,255 | 1,011 |
| **Phosphate** | 3,163 | 2,447 | 4,553 | 4,533 | 152 |

76. Viewed from a statistical perspective: the Manufacturer Defendants control approximately 82% of the nitrogen market, 90 to 95% of the potash market, and 91% of the phosphate market in the United States. The control of phosphate and potash is even more highly concentrated to just two Defendants: Mosaic and Nutrien.

**C. Defendants' Conspiracy Caused Significant Price Increases of NPK Fertilizers**

77. The rising consolidation of fertilizer manufacturers began in the early 1980s, when dropping commodity markets caused one-sixth of American farmland to go out of production and demand for fertilizer plummeted. This drop in demand, combined with an increase in input costs for producing fertilizer, led to closed production plants and the exit of many small fertilizer firms.

78. Steady consolidation in the market continued until there was a drastic increase in fertilizer prices in 2008; following the global financial crisis, however, prices again dropped. The number of manufacturers in the nitrogen fertilizer market fell from 46 to 13 between 1984 and 2008, a 72% reduction.




79. By 2012, four companies controlled 75% of the nitrogen market, three companies controlled 90% of the phosphorus market, and nearly 90% of potash was imported from Canada, where production was controlled by three firms. Fertilizer prices gradually declined again from 2013 through 2020.

80. Since 2020, fertilizer prices have steadily risen - increasing 37% between 2020 and 2025. Fertilizer prices soared in 2021, where the wholesale fertilizer index increased more than 60% in comparison to 2020 levels, with nitrogen levels jumping 95% and potash rising over 70%.



81. From the fall of 2021 through spring of 2022, fertilizer prices were at an all-time high. For example:

a. Anhydrous ammonia prices more than doubled, topping out at a record high $1,300/ton;

b. Nitrogen fertilizer rose from $450/ton to over $1,400/ton;

c. Potash and DAP both increased more than $400/ton; and

d. Monoammonium phosphate hit an all-time high in April 2022, at over $1,000/ton.

82. These increases hit U.S. farmers hard, leading to an estimated $128,000 increase in farmer-borne costs per feed grain operation farms in 2022. Iowa corn farmers report production cost increase of $238 per acre since 2020. Corn sales required to purchase one unit of MAP increased from an average of 136 bushels to 230 bushels.

83. Meanwhile, Nutrien's gross manufacturing profit margin was up 669% from 2020, but the costs of goods sold increased only 58%. Mosaic's profits increased 120%, Nutrien's increased 142%, and CF Industries' increased 212%.



84. During the last quarter of 2021, the price of nitrogen-based fertilizers, anhydrous ammonia, urea, or liquid nitrogen, increased 210%, 155%, and 159%, respectively. Phosphorus-based fertilizers, Diammonium phosphate (DAP) and Monoammonium phosphate (MAP), have increased 100% and 125%, respectively. Potash rose over 134%.

85. Nutrien's third quarter report in 2021 indicated a 51% increase in cost of goods for nitrogen production over a three-month period preceding September 30th, but their gross manufacturing margin was up over 680% in this same period.

86. Although world events such as the Covid-19 pandemic, fertilizer export restrictions in China, and Russia's war on Ukraine could explain some market fluctuation, the rising prices in the fertilizer industry and the Manufacturer Defendants' extreme profit margins cannot be explained by traditional market factors. The Manufacturer Defendants continue to extract supercompetitive margins regardless of extenuating circumstances while imposing rising costs on U.S. farmers and, in turn, American consumers.

87. Consumer prices have declined significantly since the 2021-22 spike, but fertilizer prices remain significantly higher than pre-2022 levels. In 2024, the U.S. NPK fertilizer market was valued at almost $30 billion.

88. Over the past decade, phosphate prices have increased by 60%, with the price of potash rising nearly 10% in 2025 alone. As of October 2025, the price of MAP per metric ton was $790/mt in the United States compared to $680/mt in Brazil, reflecting a structural premium of $150–$200 per metric ton.

### D. Recent Price Inflation of the NPK Fertilizer Market Does Not Align with Market Trends

89. Massive consolidation in the NPK Fertilizer Market has allowed the Manufacturer Defendants to fix and sustain inflated prices. Over the past two decades, fertilizer prices have

consistently increased despite other market factors.

90. Although fertilizer prices remained largely stable from the late 1980s through about 2004, fertilizer prices saw a dramatic increase in 2008. Nitrogen prices doubled while phosphorus and potash prices tripled. This rate of increase in fertilizer cost far exceeded costs associated with manufacturing fertilizer or other crop production costs.

91. Fertilizer prices again peaked in 2012 but gradually fell until the fall of 2021 when nitrogen fertilizer prices doubled, reaching a record high of $1,300 per ton by the spring of 2022. Nitrogen fertilizer prices doubled at this time and were consistently higher than prices for other nitrogen chemical products, compared to before 2021.

92. This extreme price spike is evidence of the Defendants' collusion. Defendants leverage the global nature of the fertilizer industry to exploit farmers, like Plaintiff, and fix prices. Both statistical and anecdotal evidence support this trend. When a globally disruptive event occurs—for example, the COVID-19 pandemic, Russia's war on Ukraine, and most recently, military strikes on Iran—Manufacturer Defendants uniformly spike fertilizer prices under the guise of supply chain disruptions.

93. Anecdotally, in recent years, U.S. farmers report calling fertilizer suppliers during a globally recognized event only to be told that pricing information is unavailable and they need to call back later, or the price given on the phone is only valid for the duration of the call and may rise later in the day.

94. Curiously though, prices never fall after global tensions ease. What's more, farmers report experiencing price spikes on fertilizers that should not be impacted by global supply chain disruptions because they are (a) produced domestically or (b) already sitting in U.S. warehouses.

95. Although an analysis of pricing data may support a correlation between NPK Fertilizer price increases and periods of global market volatility triggered by disruptive external events, such as the COVID-19 pandemic, Russia's war on Ukraine, and military strikes on Iran, no comparable correlation exists between these elevated prices and U.S. domestic demand for fertilizer or fluctuations in crop output and sales; to the contrary, NPK Fertilizer prices have remained artificially elevated even as net farm income declined and crop returns fell.

96. In numerous cases, the post-pandemic relationship between fertilizer prices and demand factors decouple. That is to say, the two data points move independent of one another or even in opposite directions.

97. In 2021, overall agricultural market trends similarly supported increased NPK Fertilizer prices. U.S. farmers generally reported strong crop returns in 2021 due to high global demand and low competitor supply caused by unfavorable weather conditions in South Africa.

98. However, when the market conditions inverted, pushing crop prices to record nominal levels for the 2022-2023 market year, fertilizer costs remained high while U.S. farmers experienced substantial price decreases in corn and soybean yields.

99. Entering 2023, the University of Missouri predicted that farmers would experience a net farm income decrease of 14% in Missouri while the overall U.S. net farm income would decrease by 19%. As corn and soybean prices continually dropped between 2023 to 2024, Missouri farmers predicted a $0.43 billion decrease in 2023 followed by a $1 billion decrease in 2024. Likewise, between 2022 to 2024, cash receipt for crop production in Iowa fell by 26%.

100. As U.S. farmers experienced a net farm income decrease of nearly 30%—from 182 billion in 2022 to 127.5 billion in 2024—the Manufacturer Defendants' corporate profits increased nearly 300% and NPK Fertilizer prices doubled.

101. In October 2025, Iowa farmer Noah Coppess explained to the United States Senate Judiciary Committee that although farm production inputs and commodity prices increased, production costs have hardly declined, and costs of crop inputs (such as seeds, fertilizers, and pesticides) increased 66 percent.

102. NPK Fertilizer prices rise quickly with crop prices in the United States, but do not follow the same declining trend when crop prices fall. This lack of alignment in downward trends highlights the anticompetitive nature of Defendants' pricing practices.

103. Furthermore, while fertilizer prices increased post-2021, producers did not subsequently increase their production. For example, market leader CF Industries' shipment volumes among four fertilizers actually declined during the period where average prices of these fertilizers increased, indicating the potential that excess capacity was maintained during this period.



**1. Natural gas price increases indicate only a nominal correlation to rising and sustained NPK Fertilizer costs**

104. To the extent that Defendants attempt to explain away the skyrocketing cost of fertilizer over the past several years by citing to the rising cost of natural gas, they omit pertinent data that indicates NPK Fertilizer prices have risen to an amount much higher than that of gas.

105. In a competitive market, prices are determined by the cost to supply a good and the willingness of a consumer to pay. A manufacturer of a good would not benefit from unilaterally raising a price in a competitive market, because consumers could simply switch to a lower-priced competitor. Thus, a sudden change in the price of goods implies either a "shock" to supply or demand conditions, or a change in competitive conditions between firms.

106. Between around 2021 and 2023, the market experienced an increase in the cost of natural gas. Natural gas is an important input in fertilizer production, and so a rise in natural gas prices would likely prompt some increase in the price of fertilizer even in the absence of collusive conduct. Insofar as an external market shock forced the Manufacturer Defendants to increase their NPK Fertilizer prices to cover natural gas costs, the natural consequence would be falling profit margins during the period of the supply disruption. However, the publicly available data indicates the opposite—the period of natural gas price increase is associated with *higher* profit margins.

107. Cost shocks can act as a coordination mechanism, allowing firms to establish a high collusive baseline price without drawing suspicion. A cartel can set prices higher than the shock actually warrants or maintain higher prices through collusion rather than resuming competition as costs return to normal.

108. Therefore, in evaluating whether the price hikes observed in this case are evidence of collusive conduct, the relevant question is not whether any external shocks occurred at all, but

the extent to which those shocks adequately explain the initial price increases and subsequent price levels. Here, they do not.

109. Moreover, Defendants hedge against input costs shocks. CF Industries confirms this in multiple financial statements:

a. CF Industries 2024 Annual Report stated: "From time to time, we utilize natural gas derivatives to hedge our financial exposure to the price volatility of natural gas, the principal raw material we use in the production of nitrogen-based products. We may use natural gas futures, swaps and option contracts traded in over-the-counter markets or on exchanges. In addition, from time to time, we may use fixed-price, physical purchase and sales contracts to hedge our exposure to natural gas price volatility."

b. The 2024 Q1 Results similarly indicated: "For the three months ended March 31, 2024, we used derivatives to cover approximately 55% of our natural gas consumption."

c. In 2025, CF Industries similarly stated: "The average cost of natural gas, including the impact of realized derivatives, reflected in the Company's cost of sales was $3.52 per MMBtu in the first half of 2025 compared to the average cost of natural gas in cost of sales of $2.53 per MMBtu in the first half of 2024."

110. As indicated in the graph below, the data similarly confirms that CF Industries maintained elevated profits even after natural gas prices declined:



111. Defendants use the rising cost of natural gas to mislead the public as manufacturers multiple opportunities to collude permit price fixing at rates untethered to natural gas prices.

**E. The U.S. NPK Fertilizer Market Is Marked by Indicia of Collusion.**

112. The U.S. NPK Fertilizer market is highly concentrated and dominated by just three companies: Nutrien, Mosaic, and CF Industries. Together, they account for the majority of domestic sales of NPK Fertilizer, giving these Defendants control over the national market.

113. High market concentration increases the likelihood of collusion and other anticompetitive practices. An industry dominated by a few companies allows for easier coordination of price increases, territorial allocation, and information sharing. Over time, Manufacturer Defendants can leverage the concentrated market to maintain supra-competitive prices.

114. As USDA Deputy Secretary Judge Stephen Vaden correctly acknowledged, Defendants Mosaic and Nutrien have successfully constrained "the supply of so many fertilizers our farmers depend on" to secure "pricing power."

115. In addition to high market concentration, the NPK Fertilizer market in the United States in marked by numerous indicial of collusion, including the exchange of confidential information (and the opportunity to do so); high barriers to entry; inelastic demand; and motive and opportunity to fix prices.

**1. The Manufacturer Defendants exchange confidential, competitively sensitive, proprietary information through IFA and TFI**

***International Fertilizer Association***

116. The International Fertilizer Association (IFA) is "the only global fertilizer association." Its members include organizations at all levels of the fertilizer supply chain: fertilizer

producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, ag tech start-ups and non-governmental organizations.

117. As of March 2026, IFA Board members include multiple Manufacturer Defendants. Kenneth Seitz, Nutrien's President and CEO, is the current Association Chair of the IFA Board, and this two-year position was previously filled by CF Industries' President and CEO at the time, Tony Will. Other Manufacturer Defendant Board members are: Svein Tore Holsether, President and CEO of Yara; Bruce Bodine; X of Mosaic; and Chris Bohn, current President and CEO of CF Industries.

118. Organizational members of IFA include BHP, CF Industries, Simplot, KAES, KAS, Koch Fertilizer, Mosaic Fertilizer, Mosaic, Nutrien, Nutrien Ag, Yara, Yara NA, OCI, Canpotex, and TFI.




*IFA Market Intelligence Data*

119. Since June 2018, IFA has generated a data collection program known as IFSTAT. As IFA explains: "IFASTAT is the leading source of fertilizer and raw materials statistics in the world. Compiled by IFA's Market Intelligence team, IFASTAT is a one-stop shop for the most

comprehensive statistical information on fertilizers and raw materials supply and fertilizer consumption."

120. IFASTAT promises users access to, among other things, (i) 70 years of global fertilizer data, (ii) 15 plus years of "supply, production & trade data", and (iii) regular market analysis.

121. The data in IFASTAT is organized into two categories: Supply and Consumption. Consumption data is accessible to the public, while supply data is available only to members. Supply data includes "production and trade detailed data from 2002 onwards by product and/or country . . . ." Information is presented to users in database and chart form, along with reports, factsheets, and webinars.

122. A key feature of IFASTAT data is its Market Outlook Reports. Only members may access the medium-term and short-term supply and demand detailed Market Outlook Reports prepared by the IFA Secretariat, but the public may view summaries of these reports. Additionally, members receive exclusive access to quarterly Fertilizer Market Update reports.

123. Other member-exclusive information on IFASTAT includes webinars, product factsheets, country-specific supply reports, and country-specific factsheets. The public may view information on a regional level, but not on a product or country level.

*IFA Meetings Presented Manufacturer Defendants the Opportunity to Collude*

124. "IFA events facilitate the sharing of information and best practices."

125. One such event is the IFA Annual Conference, a "flagship where all the key fertilizer players gather to network and learn about the latest developments in the industry."

126. Additionally, IFA coordinates annual regional events to promote industry "cooperation."

***The Fertilizer Institute***

127. At least one Defendant from every group of Manufacturer Defendants is an active member of TFI. This includes Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic.

128. As of March 2026, TFI Board members included the following Manufacturer Defendants: Bruce Bodine, President and CEO of Mosaic; Chris Bohn, President and CEO of CF Industries; Scott McGinn, Executive VP of Koch Fertilizer; Sabine Schröder, Interim President of Yara NA; and Kenneth Seitz, President and CEO of Nutrien.

*TFI Market Intelligence Data*

129. At all relevant times, TFI colluded with the Manufacturer Defendants to coordinate the exchange of information through exclusive "market intelligence data," statistical reports and surveys, and annual membership meetings.




130. TFI restricts public access to its information. The data is stored and available in a secure, members-only section of the website. In fact, documents available on TFI's website tout the benefits of membership, including that it is "**The sole source of the fertilizer industry data**

**you need for your business."** And supports this assertion by promising "Members-Only Market Volatility Information & Resources."

131. Members-only fertilizer industry data that TFI collects and distributes includes:

a. The Fertilizer RECORD: monthly data (released quarterly) on production, producer inventories, and producer disappearance;

b. Fertilizer Imports and Exports: "Monthly fertilizer trade data (quality and value) . . ."; and

c. Feedgrade Phosphate Report: a monthly report of phosphate sales, which includes historical data back to January 1984.

132. Members-only Market Intelligence Resources include analytical data on the fertilizer market, and flyers about:

a. Market Volatility Key Takeaways;

b. Fertilizer Market Volatility Talking Points;

c. Fertilizer Market Volatility White Paper; and

d. TFI Coverage of USDA's Monthly Agricultural Prices Reports.




133. Members also receive exclusive access to webinars, for example, "Navigating 2026: The Changing Landscape of the Fertilizer Market."

134. TFI promotes its ability to "leverag[e] the power of a unified industry voice" to promote membership among fertilizer manufacturers. Unsurprisingly, this only refers to the voice

of fertilizer sellers, not those who depend on a stable and affordable fertilizer supply to grow their crops.

135. Membership in TFI is awarded through an application and interview process. TFI has different levels of membership, and only certain memberships are afforded full access to participate in certain TFI committees. Membership offerings are either (a) Regular Members, for those who sell or plan to sell fertilizer products within the United States, or (b) Associate Members, those who don't sell fertilizer "but provide products or services to the fertilizer industry." Only Regular Members are afforded full access to participate in TIF committees. One benefit all members receive is "[a] direct voice in shaping the future of the fertilizer industry."

*TFI Meetings Presented Manufacturer Defendants the Opportunity to Collude*

136. In addition to providing private market data, TFI organizes multiple meetings and events each year to give members "a seat at the table" and allow "a network of industry peers . . . to stay informed and engaged" with one another.

137. During these meetings, TFI connects members of the fertilizer supply chain and "deepen[] business relationships." At TFI's Annual Business Conference, certain events over the course of the conference are "by Invitation only."

*TFI Developed Fertilizer Reporting Solutions*

138. Fertilizer Reporting Solutions (FRS) is an "industry-led platform designed to streamline fertilize tonnage reporting through a single, centralized system." FRS was developed "in partnership with TFI members" and officially launched in 2024. The founding partners of the FRS are co-conspirators, Simplot and BHP.

139. In 2026, TFI plans to release a "Platinum version" of FRS which promises to include an integrated calculator tool.

140. In an FRS demonstration webinar, TFI explained that the database was developed through meetings TFI members, including an in-person summit where present industry leaders acknowledged verbalized that the data of FRS "is an area when it relates to fertilizer tonnage reporting, where we don't need to compete. We compete in a lot of places . . . but we don't need to compete here, so let's get this figured out together."




141. Data contained in the FRS includes lists of:

a. State-specific fertilizer reporting guidelines;

b. Licensed fertilizer companies who are authorized to sell fertilizer in a specific state;

c. Registered products based on state's registration system

d. Product categories based on state's registration system; and

e. State survey of reporting guidelines.

**2. The NPK Fertilizer market is characterized by inelastic demand.**

142. The NPK Fertilizer market is also highly inelastic, which makes it easily susceptible to cartel and other anticompetitive behavior. When demand is inelastic, increases in price do not

meaningfully reduce the quantity purchased, allowing firms engaged in collusion to raise prices without risking significant loss of sales.

143. Demand for NPK Fertilizers is inelastic because NPK Fertilizers provide the macronutrients necessary to sustain crop production. For humanity to survive, we depend on industrialized agriculture and crop farming, which in turn depends on replenishing nutrient rich soil with fertilizers. U.S. farmers must replenish the soil with fertilizers every year, sometimes multiple times throughout the year.

144. Buyers of NPK Fertilizer like Plaintiff are more vulnerable to collusion among Defendants, who are able to raise prices without fearing lost sales or substitution.

**3. The NPK Fertilizer market has high barriers to entry.**

145. Competition is further restrained in the NPK Fertilizer market due to extremely high barriers to entry. Fertilizer production requires significant capital investment. For example, a new nitrogen facility can cost approximately $5 billion to construct.

146. There are also other high fixed costs associated with entering the market, as production is capital intensive. Nutrien and CF Industries, the largest two producers of nitrogen fertilizer, control multiple distribution networks as well as fertilizer inputs and logistics channels, making it challenging for new entrants in the market to gain share. This offers them an easy way to exclude potential rivals and maintain their cartel.

147. There are no economically viable substitutes in the U.S. market for NPK Fertilizer, which further enhances the Manufacturer Defendants' market power and domination. At the same time, the core products at issue are relatively homogenous, if not fungible.

**4. Nitrogen fertilizer products are highly homogenous**

148. There are five main distinct types of nitrogen fertilizers: Urea, Ammonium Nitrate, Ammonium Sulfate, Calcium Ammonium Nitrate, and Anhydrous Ammonia. Each type differs

based on its nitrogen concentration, and farmers may select a type based on their soil and plant needs. However, aside from a few unique formulations available on the market, the core products in this market are homogenous if not fungible.

**5. Defendants also have motive and the opportunity to collude.**

149. In a competitive market, there would be price competition which would, absent collusion, create an incentive for each player to set prices that would undercut those of its rivals. Instead, the Manufacturer Defendants engage in "shadow pricing," following one another's pricing closely in terms of both level and movement, which is suggestive of price fixing.

150. The graphic below compares the pricing for nitrogen (ammonia) fertilizer by Nurtien and CF Industries between 2017 and 2025:




151. These rising prices do not correspond to Defendants' costs. For example, for the largest producer of nitrogen fertilizer, CF Industries, which controls 39% of the market and is widely regarded as a price leader, cost as a percentage of revenue has been on a steady decline since 2016, while gross profit margins have increased significantly over the same period.

152. On its 2021 second quarter earnings call, CF Industries stated: "And in a demand-driven market, we're trading above where the cost curve economics are right now. So again, all of that provides a really great operating environment for us."

153. In 2021, CF Industries and Koch announced their fertilizer prices within 2 hours of one another, pricing their products at prices within $25.

154. Defendants' networks of relationships also include at least two joint ventures: Koch Industries and CF Industries operate a joint venture in Trinidad-based Point Lisas Nitrogen Limited, and Canpotex is a "joint venture that is wholly owned by two Saskatchewan potash producers—Mosaic and Nutrien—with each shareholder having an equal ownership in the company."

**6. Defendants coordinate activity suggests the formation of an NPK Fertilizer cartel**

155. The numerous plus factors available for collusion facilitated Defendants' insidious coordination of inflated NPK Fertilizer prices, suggesting the emergence of an NPK Fertilizer cartel from around 2020.

156. The graph below shows the coordinated profit margins of Nutrien and CF Industries, aligning with the probable start of the NPK Fertilizer Cartel:



157. Nutrien's profit on all NPK Fertilizer remained elevated after the market stabilized:




158. In fact, a similar pattern is oberservable for multiple Manufacturer Defendants. The gross profit margin remained elevated for Mosaic, Nutrien, and CF Industries.

**F. Plaintiff and the Class Have Suffered Antitrust Injuries.**

159. As TFI President and CEO Corey Rosenbusch explained to the Senate Judiciary Committee, "U.S. fertilizer producers are investing billions of dollars to maintain and upgrade their facilities" every year. As a result, Manufacturer Defendants' dominant market positions remain protected from meaningful competitive threats.

160. Defendants' anticompetitive conduct has had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to NPK Fertilizers;

b. The prices of NPK Fertilizers have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c. Direct purchasers of NPK Fertilizer have been deprived of free and open competition; and

d. Direct purchasers of NPK Fertilizers, including Plaintiff, paid artificially inflated prices.

161. The ultimate purpose of Defendants' conduct is to raise, fix, maintain, or stabilize the price of NPK Fertilizers and, as a direct and foreseeable result, Plaintiff and the Class have paid supra-competitive prices for the NPK Fertilizers during the Class Period.

162. By reason of the antitrust violations alleged herein, Plaintiff and Class Members have sustained injury, having paid higher prices for the NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

## VI. CLASS ACTION ALLEGATIONS

163. Plaintiff brings this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the following Class:

> All entities and individuals who directly purchased NPK Fertilizers from any Manufacturer Defendant in the United States from January 1, 2020, until the present.
>
> Specifically excluded from the Class are (1) the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; (2) Class Counsel and their employees, and (3) the judicial officers and their immediate family members and associated court staff assigned to this claim.

164. Plaintiff reserves the right to amend the Class definition, including, and without limitation, the Class Period.

165. The above-defined Class Members are readily identifiable from information and records in Defendants' possession.

166. While Plaintiff does not know the exact number of Class Members, due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

167. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased NPK Fertilizers directly from one or more of the Manufacturer Defendants and were damaged by the same common course of wrongful conduct.

168. Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. Such questions of law and fact common to the Class include, but are not limited to:

a. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of NPK Fertilizers sold in the United States in violation of federal antitrust laws;

b. Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

c. Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

d. The identity of the participants of the alleged conspiracy;

e. The scope and duration of the alleged conspiracy;

f. The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

g. The effect of Defendants' alleged conspiracy on the prices of NPK Fertilizers that were sold in the United States during the Class Period;

h. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and other members of the Class;

i. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j. The appropriate class-wide measure of damages; and

k. Whether the statute of limitations was tolled or whether Defendants fraudulent concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

169. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for NPK Fertilizers. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

170. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

171. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class Members do not have interest in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

172. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

173. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff have as a result of the unlawful conspiracy alleged in this Complaint.

174. Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of NPK Fertilizers whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and industry data exchange agreements.

175. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

176. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of NPK Fertilizer by a Manufacturer Defendant constituted a new cause of action for purposes of the statute of limitations.

## VIII. CLAIMS FOR RELIEF

### COUNT I

**Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Sections 4 and 16 of the Clayton Act**

**(Against All Defendants)**

177. Plaintiff incorporates and realleges the allegations set forth in the paragraphs 1 through 176 as though fully set forth herein.

178. At least as early as January 1, 2020, and continuing through the present, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for NPK Fertilizers in the United States to supra-competitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

179. Specifically, Defendants have contracted, combined, and conspired to (1) raise, fix, maintain, and/or stabilize the prices of NPK Fertilizer sold directly to purchasers in the United States, and (2) share competitively sensitive confidential information that enable coordinated non-competitive conduct on pricing and output.

180. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under a rule of reason analysis because Defendants' agreement is anticompetitive with no valid procompetitive justification. Even if valid procompetitive justifications existed, such justifications could have been reasonably achieved through less restrictive means of competition.

181. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of NPK Fertilizers has been restrained, suppressed, and /or eliminated in the United States;

b. Prices for NPK Fertilizer sold by the Manufacturer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c. Those who purchased NPK Fertilizers from the Manufacturer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

182. Plaintiff and Class Members have been injured and will continue to be injured by paying artificially inflated prices for the NPK Fertilizers purchased from the Manufacturer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

183. Plaintiff and Class Members seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

**COUNT II**

**Restraint of Trade in Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18**

**(Against Koch Defendants)**

184. Plaintiff incorporates and realleges the allegations set forth in the paragraphs 1 through 176 as though fully set forth herein.

185. Defendants' unlawful conduct, including the Wever Acquisition described above, substantially lessened competition in the market for NPK Fertilizer in the United States.

186. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members were injured in their business or property.

187. This offense is likely to continue unless injunctive relief is granted.

188. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT III**

**Declaratory and Injunctive Relief for Violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 18**

**(Against All Defendants)**

189. Plaintiff incorporates and realleges the allegations set forth in the paragraphs 1 through 176 as though fully set forth herein.

190. Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

191. Plaintiff's allegations described herein constitute violations of Section 1of the Sherman Act and Section 7 of the Clayton Act.

192. Defendants effectuated a scheme to restrain trade and substantially lessen competition in the United States market for NPK Fertilizer.

193. There is and was no legitimate, non-pretextual, procompetitive business justification for Defendants' conduct that outweighs its harmful effect.

194. As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

195. The purpose and effect of the scheme was to prevent or delay competition in order to charge supra-competitive prices for NPK Fertilizers without a substantial loss of sales.

196. The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

197. Plaintiff and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Complaint. Their injury includes paying higher prices for NPK Fertilizers than they would have paid in the absence of those violations. These injuries will continue unless halted.

198. Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a Declaratory Judgment that Defendants' conduct constitutes a violation of § 1 of the Sherman Act.

199. Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## IX. PRAYER FOR RELIEF

200. Plaintiff, on behalf of itself and members of the Class, requests relief as follows:

a. That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiff be named as Class Representatives of the Class, that the undersigned be named as Lead Class

Counsel of the Class, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

b. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

c. That the Court award Plaintiff and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

d. That the Court issue appropriate injunctive and other equitable relief against Defendants;

e. That the Court award Plaintiff pre- and post-judgment interest;

f. That the Court award Plaintiff their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts, as permitted by law; and

g. That the Court award any and all such other relief as the Court may deem just and proper.

## X. JURY DEMAND

201. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Respectfully submitted,

Dated: April 9, 2026

*/s/ Daniel J. Mogin*

Daniel J. Mogin
(*pro hac vice* forthcoming)
Timothey Z. LaComb
(*pro hac vice* forthcoming)
Joy M. Sidhwa
(*pro hac vice* forthcoming)
**MOGIN LAW LLP**
4225 Executive Square, Suite 600
La Jolla, California 92037
Tel: (619) 687-6611
dmogin@moginlawllp.com
tlacomb@moginlawllp.com
jsidhwa@moginlawllp.com

Richard F. Lombardo (29468)
Leland M. Shurin (20440)
George Cutucache (77777)
**SHAFFER LOMBARDO SHURIN**
2001 Wyandotte Street
Kansas City, Missouri 64108
Telephone: 816-931-0500
rlombardo@sls-law.com
lshurin@sls-law.com
gcutucache@sls-law.com

Benjamin J. Widlanski
(*pro hac vice* forthcoming)
Brandon M. Sadowsky
(*pro hac vice* forthcoming)
Lindsey E. Graham
(*pro hac vice* forthcoming)
**KOZYAK TROPIN THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
bwidlanski@kttlaw.com
bsadowsky@kttlaw.com
lgraham@kttlaw.com

Joseph R. Saveri (*pro hac vice* forthcoming)
Diane S. Rice (*pro hac vice* forthcoming)
Cadio Zirpoli (*pro hac vice* forthcoming)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, California 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
drice@saverilaw.com
czirpoli@saverilawfirm.com

## CERTIFICATE OF ARTIFICIAL INTELLIGENCE USE

The undersigned hereby certifies that generative artificial intelligence was used to prepare this Complaint. The specific generative artificial intelligence tool(s) used include Harvey AI, Westlaw Co-Counsel, and Gemini. The undersigned has independently verified the accuracy of every citation to the law and/or the record, and the accuracy of any language drafted by generative artificial intelligence, including quotations, citations, paraphrased assertions, facts, and legal analysis.

*/s/* Benjamin J. Widlanski